## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES ALTON KINCADE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:19-cv-00233-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), plaintiff James Alton Kincade seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Kincade's claim for disability insurance benefits.  For the reasons stated below, the Court affirms the Commissioner's decision because substantial evidence supports the decision.

## I.    PROCEDURAL HISTORY

Mr. Kincade applied for disability insurance benefits.  (Doc. 6-5, p. 15).  He alleges that his disability began on May 27, 2016.  (Doc. 6-5, p. 15).  The Commissioner initially denied Mr. Kincade's claim.  (Doc. 6-5, p. 15). Mr. Kincade requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 6-6, p. 13).

The ALJ issued an unfavorable decision. (Doc. 6-3, pp. 18-29). The Appeals Council declined Mr. Kincade's request for review, making the Commissioner's decision final for this Court's review. (Doc. 6-3, p. 2). *See* 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then a district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.  SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Mr. Kincade met the Social Security Act's insured status requirements through December 31, 2021, and that Mr. Kincade had not engaged in substantial gainful activity since the alleged onset date of May 27, 2016. (Doc. 6-3, p. 20). The ALJ determined that Mr. Kincade was suffering from the following severe impairments:  hearing loss not treated with cochlear implantation,

vestibular system disorder, and Meniere's disease. (Doc. 6-3, p. 21).[1] The ALJ found that Mr. Kincade had the following non-severe impairments: hypertension, unspecified abdominal pain, cholelithiasis, gastroesophageal reflux disease without esophagitis, unspecified liver disorder, and affective order, including mild recurrent major depression and generalized anxiety disorder. (Doc. 6-3, pp. 21-22).[2] Based on a review of the medical evidence, the ALJ concluded that Mr. Kincade did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 23).

Given Mr. Kincade's impairments, the ALJ evaluated his residual functional capacity. The ALJ determined that Mr. Kincade had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with restrictions. (Doc. 6-3, p. 23).

---

[1] "A cochlear implant is a small electronic device that electrically stimulates the cochlear nerve (nerve for hearing)." https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/cochlear-implant-surgery (last visited Feb. 27, 2020).

The vestibular system is the "link between [a person's] inner ear . . . and brain [that] helps [with] balance when . . . get[ting] out of bed or walk[ing] over rough ground." Symptoms of a person with vestibular disorder may include dizziness, trouble balancing, and hearing and vision problems. https://www.webmd.com/brain/vestibular-disorders-facts#1 (last visited Feb. 27, 2020).

"Meniere's disease is a disorder of the inner ear that can lead to dizzy spells (vertigo) and hearing loss." https://www.mayoclinic.org/diseases-conditions/menieres-disease/symptoms-causes/syc-20374910 (last visited Feb. 27, 2020).

[2] "Choledocholithiasis refers to the presence of one or more gallstones in the common bile duct (CBD)." https://emedicine.medscape.com/article/175667-overview (last visited Feb. 27, 2020).

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, . . . [normally] he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b). The ALJ limited Mr. Kincade to lifting, carrying, pushing, or pulling 20 pounds occasionally and ten pounds frequently. (Doc. 6-3, p. 23). In an eight-hour day with normal breaks, the ALJ restricted Mr. Kincade to six hours of sitting, standing, and walking. (Doc. 6-3, p. 23). The ALJ precluded Mr. Kincade from using ramps, stairs, ladders, ropes, and scaffolds and working on moving or unguarded machinery or in unprotected heights or environments with extreme temperatures, humidity, vibration, or noise. (Doc. 6-3, p. 14). The ALJ limited Mr. Kincade to occasional balancing, stooping, kneeling, crouching, and crawling. (Doc. 6-3, p. 23). The ALJ found that Mr. Kincade would have "difficulty hearing in manufacturing plants and heavy traffic" but would "not pose a threat to self or others." (Doc. 6-3, p. 23).

Based on this RFC, the ALJ concluded that Mr. Kincade could not perform his past relevant work. (Doc. 6-3, p. 27). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Kincade could

perform, including small parts assembler, garment sorter, and router. (Doc. 6-3, p. 28). Accordingly, the ALJ determined that Mr. Kincade was not under a disability within the meaning of the Social Security Act. (Doc. 6-3, p. 29).

## IV. ANALYSIS

In determining Mr. Kincade's RFC, the ALJ assigned little weight to Dr. Simpson's medical source opinion. (Doc. 6-3, p. 26). The ALJ found that Mr. Kincade's daily activity evidence supported her RFC finding. (Doc. 6-3, p. 27). Mr. Kincade challenges these aspects of the ALJ's decision. (Doc. 8, p. 1). The Court begins with a summary of Mr. Kincade's medical records and then considers each issue in turn.

### A. Mr. Kincade's Medical Records[3]

The record contains limited information about Mr. Kincade's early Meniere's treatment history. In July 2004, Mr. Kincade saw Dr. Simpson, an otolaryngologist with ENT Associates of Alabama, P.C. Mr. Kincade complained of a Meniere's flare-up in the right ear. (Doc. 6-10, pp. 10, 58). Dr. Simpson noted that earlier in 2004, Mr. Kincade had seen Dr. Bhuta, another physician practicing with ENT Associates. (Doc. 6-10, p. 58).[4] Dr. Simpson stated on the July 2004 treatment

_____

[3] The Court has reviewed but not summarized Mr. Kincade's complete medical file. In this opinion, the Court discusses records that are relevant to Mr. Kincade's challenge of the ALJ's treatment of Dr. Simpson's opinion.

[4] Dr. Bhuta's treatment notes are not part of the record.

document that "a couple of years" had passed since Mr. Kincade had seen him for Meniere's symptoms. (Doc. 6-10, p. 58).

Under the 2004 treatment regimen, Mr. Kincade reported that his left ear had been "doing pretty well" and that his vertigo had improved. (Doc. 6-10, p. 58). According to Mr. Kincade, his episodes of vertigo occurred daily and lasted one hour. (Doc. 6-10, p. 58). Mr. Kincade stated that he had noticed some hearing loss. (Doc. 6-10, p. 58).

Dr. Simpson detected an improvement in Mr. Kincade's left ear and a hydrops pattern in the right ear. (Doc. 6-10, p. 58).[5] Dr. Simpson summarized his impressions:

> I think [Mr. Kincade] has bilateral Meniere's although just the right ear is acting up right now. Responding. The right ear is better than last time so we are going to continue all the medicines Dr. Bhuta started along with adding meclizine PRN for the dizziness. I do want to go ahead with some additional blood work. Will test him for IgG molds and will go ahead with IgE inhalants. If significant positives on one or both of these then shots could be a very good option as we have already seen support for this being bilateral Meniere's and not just unilateral case.

(capitalization omitted).[6] Dr. Simpson instructed Mr. Kincade to return in two weeks. (Doc. 6-10, p. 58).

---

[5] "Hydrops means that the pressure in the inner ear is elevated." https://www.dizziness-and-balance.com/disorders/menieres/hydrops.html (last visited Mar. 2, 2020).

[6] Meclizine is an antihistamine . . . . used to treat symptoms of vertigo (dizziness or spinning sensation) caused by disease that affects [the] inner ear." https://www.drugs.com/meclizine.html

More than ten years later, Mr. Kincade saw Dr. Morgan in early May 2015 and complained of several months of dizziness and decreased hearing or "fullness" in the left ear without improvement in recent days. (Doc. 6-10, p. 52). Mr. Kincade also complained of "spinning vertigo" that occurred when he was in bed. (Doc. 6-10, p. 52). According to the treatment record, Mr. Kincade's Meniere's disease was "moderate," and Mr. Kincade had experienced symptoms for ten years. (Doc. 6-10, p. 52).

Mr. Kincade reported other symptoms including roaring, buzzing, pressure, and pain in the ears, difficulty understanding, imbalance, lightheadedness, spinning, unsteadiness, and nausea. (Doc. 6-10, p. 53). Dr. Morgan noted that Mr. Kincade had "hearing to conversational voice," normal limits of the auditory canals and the tympanic membrane, and no lesions or tenderness. (Doc. 6-10, p. 54). Mr. Kincade's audiogram results "show[ed] hearing loss in both ears," discrimination of 76% in the right ear, and 84% in the left ear. (Doc. 6-10, p. 54). Dr. Morgan prescribed Zofran (one 4 mg tablet every 12 hours) for nausea, Antivert (one 25 mg tablet twice daily as needed), and prednisone (three 10 mg tablets for three mornings; then two tablets for three mornings). (Doc. 6-10, pp. 54-55).[7] Dr. Morgan

_____

(last visited Mar. 2, 2020). PRN is an "abbreviation meaning 'when necessary.'" https://www.medicinenet.com/script/main/art.asp?articlekey=8309 (last visited Mar. 2, 2020).

[7] Zofran "is used alone or with other medications to prevent nausea and vomiting." https://www.webmd.com/drugs/2/drug-30/zofran-oral/details (last visited Mar. 4, 2020).

recommended that Mr. Kincade drink more fluids and consume less salt and processed foods.  (Doc. 6-10, p. 55).  Dr. Morgan instructed Mr. Kincade to return in seven days.  (Doc. 6-10, p. 55).

Mr. Kincade followed up with Dr. Morgan in mid-May 2015.  (Doc. 6-10, p. 47).  Mr. Kincade reported that he was "doing better" but that he still had problems. (Doc. 6-10, p. 47).  Mr. Kincade stated that he had reduced salt and increased fluids. (Doc. 6-10, p. 47).  Mr. Kincade denied roaring, buzzing, pressure, and pain in the ears;  difficulty  understanding;  imbalance,  and  lightheadedness,  spinning, unsteadiness, and nausea.  (Doc. 6-10, pp. 47-48).  Mr. Kincade's audiogram revealed improved hearing in the left ear and no change in the right ear.  (Doc. 6-10, p. 48).  Dr. Morgan scheduled Mr. Kincade for an MRI and instructed Mr. Kincade to return in one week.  (Doc. 6-10, p. 48).  Mr. Kincade's medication plan included prednisone and hydrochlorothiazide.  (Doc. 6-10, p. 49).

In late May 2015, Mr. Kincade saw Dr. Morgan and complained of tinnitus. (Doc. 6-10, p. 40).[8]  According to the record of Mr. Kincade's visit, Mr. Kincade stated that he "fe[lt] like he [was] better."  (Doc. 6-10, p. 40).  Mr. Kincade denied

---

"Antivert  is  used  to  treat  or  prevent  nausea,  vomiting,  and  dizziness." https://www.drugs.com/antivert.html (last visited Mar. 4, 2020).

Prednisone is a corticosteroid "used to treat conditions such as . . . severe allergies." https://www.medicinenet.com/prednisone-oral/article.htm (last visited Mar. 4, 2020).

[8] "Tinnitus is the perception of noise or ringing in the ears."  https://www.mayoclinic.org/diseases-conditions/tinnitus/symptoms-causes/syc-20350156 (last visited Mar. 5, 2020).

roaring, buzzing, pressure, and pain in the ears; difficulty understanding; and imbalance, lightheadedness, spinning, unsteadiness, and nausea. (Doc. 6-10, pp. 40-41). Dr. Morgan told Mr. Kincade that the results of the MRI were negative. (Doc. 6-10, p. 40; *see* Doc. 6-10, pp. 44-45). Mr. Kincade's audiogram showed hearing improvement of "almost normal" for low frequencies in the left ear. (Doc. 6-10, p. 41). According to the audiogram, Mr. Kincade was experiencing high frequency hearing loss bilaterally. (Doc. 6-10, p. 42). The discrimination level of Mr. Kincade's right ear had decreased from 76% to 60%. (Doc. 6-10, pp. 42, 54). Dr. Morgan instructed Mr. Kincade to take hydrochlorothiazide and return if the problems continued. (Doc. 6-10, p. 42).

Mr. Kincade returned to ENT Associates and complained of dizziness to Dr. Morgan in March 2016. (Doc. 6-10, p. 34). According to Mr. Kincade, dizziness caused him "to lay[] in bed for a while." (Doc. 6-10, p. 34). Mr. Kincade denied nausea. (Doc. 6-10, p. 35). Dr. Morgan reported that Mr. Kincade had "a long term history of Meniere's" but that the practice group had not seen Mr. Kincade "in almost a year." (Doc. 6-10, p. 34). Dr. Morgan noted that Mr. Kincade "did not get dizzy," but an audiologist observed "increased dizziness" when she tested Mr. Kincade's middle ear. (Doc. 6-10, pp. 34, 38). On another testing record, the audiologist noted that Mr. Kincade complained of "increased ringing." (Doc. 6-10, p. 39). Mr. Kincade's medications included hydrochlorothiazide, prednisone, and Valium.

(Doc. 6-10, p. 36).  Dr. Morgan classified the results of Mr. Kincade's tympanogram as type "A".  (Doc. 6-10, p. 36).[9]  Dr. Morgan assessed "severe bilateral sensorineural hearing loss" with asymmetrical loss of the right side.  (Doc. 6-10, p. 36).  Dr. Morgan instructed Mr. Kincade to return if the symptoms got worse.  (Doc. 6-10, p. 37).

In mid-March 2016, Dr. Morgan signed a Family and Medical Leave Act form certifying that Mr. Kincade would be unable to perform job functions and would need to take leave when he experienced a flare-up.  (Doc. 6-10, pp. 72-73).  According to the FMLA document, the symptoms from a flare-up would preclude Mr. Kincade from "stooping, bending, [and making] sudden movements" and would make it "medically necessary for [him] to be absent from work."  (Doc. 6-10, p. 73).  The frequency and duration of Mr. Kincade's flare-ups were "unknown."  (Doc. 6-10, p. 73).

Mr. Kincade returned to Dr. Morgan in June 2016 and complained of dizziness, hearing loss, tinnitus, difficulty understanding, imbalance, spinning, unsteadiness, and nausea.  (Doc. 6-10, p. 28).  According to Mr. Kincade, his problems coincided with traveling to the beach two weeks earlier.  (Doc. 6-10, p.

---

[9] "Tympanometry, or measurement of the acoustic immittance of the ear, obtains information about the state of the middle ear as a function of ear canal pressure. . . . Type A tympanogram indicates normal middle ear status."  https://www.sciencedirect.com/topics/medicine-and-dentistry/tympanometry (last visited Mar. 4, 2020).

28).  Mr. Kincade stated that medication had helped his tinnitus for a time but that the tinnitus "ha[d] gotten worse."  Mr. Kincade reported that tinnitus "happen[ed] more often."  (Doc. 6-10, p. 28).  Dr. Morgan diagnosed Mr. Kincade with Meniere's disease and bilateral hearing loss.  (Doc. 6-10, p. 30).  Dr. Morgan started Mr. Kincade on Valium and steroids, refilled the prednisone prescription, and planned to discuss Mr. Kincade's case with Dr. Simpson.  (Doc. 6-10, p. 30).  Dr. Morgan instructed Mr. Kincade to return if the problems persisted.  (Doc. 6-10, p. 30).

In July 2016, Mr. Kincade saw Dr. Morgan and complained of vertigo and the Meniere's disease "getting worse."  (Doc. 6-10, p. 11).  Dr. Morgan stated that Valium and steroids had not eased Mr. Kincade's symptoms.  (Doc. 6-10, p. 11).  Dr. Morgan reported that Mr. Kincade's VNG showed "abnormal optokinetics which could be CNS or pharmacological."  (Doc. 6-10, p. 11).  Dr. Morgan instructed Mr. Kincade "to move his head minimally" because peripheral positional changes suggested "possible benign positional vertigo."  (Doc. 6-10, p. 11).  Dr. Morgan noted that Mr. Kincade might need a new MRI if his condition declined.  (Doc. 6-10, p. 11).

In early October 2016, Mr. Kincade visited Dr. Meadows, a physician with Cullman Primary Care's psychiatric practice.  (Doc. 6-11, pp. 29, 43-44).  Mr. Kincade reported his Meniere's diagnosis and complained of tinnitus, hearing loss in the right ear, vertigo, nausea, and "issues with balance."  (Doc. 6-11, p. 44).  Mr.

Kincade stated that he "ha[d] trouble judging" which lane the car was in during a beach trip and stopped driving and working because of his Meniere's symptoms. (Doc. 6-11, p. 44). Mr. Kincade reported taking HTCZ and aspirin. (Doc. 6-11, p. 44). Dr. Meadows noted that Mr. Kincade had a "[h]istory of Meniere's disease with significant vertigo[,] nausea[, and] multiple failed treatments." (Doc. 6-11, p. 44).

In October 2016, Mr. Kincade followed up with Dr. Simpson and complained of mild, intermittent bilateral hearing loss, difficulty understanding, imbalance, lightheadedness, spinning, unsteadiness, and nausea. (Doc. 6-10, pp. 64, 65). Mr. Kincade also reported experiencing intermittent dizzy spells that lasted several hours and ringing in his left ear. (Doc. 6-10, p. 64). Dr. Simpson noted that Mr. Kincade had sought treatment for similar symptoms and received a bilateral Meniere's diagnosis 12 years earlier. (Doc. 6-10, p. 64).

Dr. Simpson stated that Mr. Kincade's right ear may have "reached a burn out stage" and that the left ear had "gotten clearly worse." (Doc. 6-10, p. 64). Dr. Simpson reviewed an August 2016 MRI film and did not locate anything to address. (Doc. 6-10, p. 64). Dr. Simpson noted that the videonystagmography (VNG) results suggested "more central findings." (Doc. 6-10, p. 64).[10] According to Dr. Simpson,

---

[10] "Videonystagmography (VNG) is a test that measures a type of involuntary eye movement called nystagmus. . . . VNG is used to find out if [a person] ha[s] a disorder of the vestibular system (the balance structures in [the] inner ear) or in the part of the brain that controls balance." https://medlineplus.gov/lab-tests/videonystagmography-vng/ (last visited Mar. 2, 2020).

the "bilateral involvement" could account for the centralized interpretation of the VNG. (Doc. 6-10, p. 64).

Dr. Simpson observed that Mr. Kincade had "no ataxia, fine coordination within the normal limits," and a "normal gait." (Doc. 6-10, p. 67).[11] Mr. Kincade's audiogram results showed an improved discrimination score, but other scores were lower. (Doc. 6-10, p. 67). Dr. Simpson's diagnoses were Meniere's disease and bilateral and right sensorineural hearing loss. (Doc. 6-10, p. 67). Dr. Simpson told Mr. Kincade that bilateral cases "often [have] a systemic component such as allergy, autoimmune, or thyroid, etc." (Doc. 6-10, p. 67) (capitalization omitted). Dr. Simpson instructed Mr. Kincade to plan for allergy testing and take hydrochlorothiazide (one 25 mg tablet daily) and Zyrtec (one over-the-counter tablet nightly). (Doc. 6-10, p. 67).[12] Dr. Simpson recommended against ear surgery unless Mr. Kincade's condition continued to deteriorate. Dr. Simpson told Mr. Kincade to return in two weeks. (Doc. 6-10, p. 67).

---

[11] "Ataxia is typically defined as the presence of abnormal, uncoordinated movements. This usage describes signs [and] symptoms without reference to specific disease. An unsteady, staggering gait is described as an ataxic gait because walking is uncoordinated and appears to be 'not ordered.'" https://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/ataxia/conditions/ (last visited Mar. 3, 2020).

[12] "HCTZ (hydrochlorothiazide) is a thiazide diuretic (water pill) that helps prevent [a person's] body from absorbing too much salt, which can cause fluid retention." https://www.drugs.com/hctz.html (last visited Mar. 3, 2020).

"Zyrtec (cetirizine) is an antihistamine that reduces the effects of natural chemical histamine in the body." https://www.drugs.com/zyrtec.html (last visited Mar. 3, 2020).

In November 2016, Mr. Kincade saw Dr. Simpson and complained of mild, intermittent bilateral hearing loss. (Doc. 6-10, p. 60). Mr. Kincade reported that he was "doing so-so" and that he had no associated symptoms. (Doc. 6-10, p. 60). Mr. Kincade stated that he was "a little bit more stable" but that he had fluctuating hearing and balance. (Doc. 6-10, p. 60). Dr. Simpson reported improvement in the audio frequency level and speech recognition threshold (SRT) in Mr. Kincade's left ear. (Doc. 6-10, p. 60).[13] Dr. Simpson noted that the discrimination rating in Mr. Kincade's left ear had decreased by one word. (Doc. 6-10, p. 60).

Dr. Simpson reported "unchanged and unremarkable" ENT findings. (Doc. 6-10, p. 61) (capitalization omitted). Dr. Simpson wrote:

> We think we are dealing with bilateral Meniere's. The VNG [videonystagmography] was a little bit hard to interpret which could mean either that there is bilateral involvement for the inner ears or perhaps a central component as well. Perhaps the central mechanisms are having some difficult compensating for the other issues. [Mr. Kincade] is certainly a candidate for a dex perfusion. I would not lean toward gentamicin at all in a case like this with that previous VNG, but dex is reasonable in the left ear. It is [Mr. Kincade's] better ear though by far and so we have to be very careful about instrumenting that ear. With the trend of improvement, I would not do it yet.

(Doc. 6-10, p. 61). Dr. Simpson recommended allergy testing. Mr. Kincade stated that he needed to wait for one month for allergy testing for financial reasons. (Doc.

---

[13] "The SRT is defined as the lowest hearing level at which the patient correctly repeats 50% of a list of spondaic words." https://medical-dictionary.thefreedictionary.com/SRT (last visited Mar. 2, 2020).

6-10, p. 61).  Dr. Simpson instructed Mr. Kincade to take the diuretic and Zyrtec regularly and meclizine as needed for a "sudden onset" of vertigo and to return in two months unless he (Mr. Kincade) experienced "a clear cut worsening trend." (Doc. 6-10, pp. 61-62).[14]

Mr. Kincade returned to Dr. Simpson in January 2017 and complained of fluctuating hearing in the left ear.  (Doc. 6-10, p. 75).  Dr. Simpson indicated that Mr. Kincade's ability to hear in the right ear was "pretty much gone."  (Doc. 6-10, p. 75).  Mr. Kincade reported intermittent dizziness.  (Doc. 6-10, p. 75).

Mr. Kincade did not have allergy testing.  (Doc. 6-10, p. 75).  Dr. Simpson recommended either identifying and managing the allergies or performing a steroid perfusion in the left ear.  (Doc. 6-10, p. 75).  Dr. Simpson advised that Mr. Kincade should proceed cautiously about surgery on the left hearing ear  (Doc. 6-10, p. 76).  Dr. Simpson's staff investigated the expense of allergy testing based on Mr. Kincade's insurance.  (Doc. 6-10, p. 76).  Mr. Kincade stated that he would decide later about the "best timing" for that testing.  (Doc. 6-10, p. 76).  Dr. Simpson gave Mr. Kincade a steroid injection.  (Doc. 6-10, pp. 75, 77).

In March, April, and June 2017, Mr. Kincade visited Dr. Elliott of Cullman Primary Care for medication refills.  (Doc. 6-11, pp. 6, 7, 13, 23).  Mr. Kincade told

---

[14] Meclizine is the generic name for Antivert.  https://www.drugs.com/antivert.html (last visited Mar. 4, 2020).

Dr. Elliott that he had stopped working because of Meniere's problems and filed for disability. (Doc. 6-11, pp. 7, 13, 23). According to Dr. Elliott's treatment records, Mr. Kincade had "[g]ood exercise habits," "[n]o physical disability," and normal activities of daily living. (Doc. 6-11, pp. 7, 13, 23). Based on Dr. Elliott's recommendation, Mr. Kincade completed a stress test in March 2017. (Doc. 6-11, pp. 19-20).

In early August 2017, Mr. Kincade stated that he missed an appointment at Cullman Primary Care because of Meniere's symptoms and his inability to "get off the couch." (Doc. 6-11, pp. 29-39). Also in August 2017, Mr. Kincade visited Dr. Bluhm for a gastroenterological appointment. (Doc. 6-10, p. 80). After examining Mr. Kincade, Dr. Bluhm noted that Mr. Kincade had a normal gait and station. (Doc. 6-10, p. 81).

In October 2017, Dr. Simpson completed a medical source statement for Mr. Kincade. (Doc. 6-11, pp. 53-55). Dr. Simpson stated that Mr. Kincade was a patient in 2002 but that 2004 was the date of the oldest treatment note. (Doc. 6-11, p. 53). After a break in treatment, Dr. Simpson noted that Mr. Kincade returned in 2015 "for inner ear complaints." (Doc. 6-11, p. 53).

Dr. Simpson's diagnoses included "suspected" bilateral Meniere's disease, right asymmetrical sensorineural hearing loss, vertigo, dizziness, anxiety, tremulousness, hypertension, and possible central vertigo and adverse drug effect.

(Doc. 6-11, p. 53).  Dr. Simpson identified vertigo, nausea/vomiting, malaise, mood changes, mental confusion/inability to concentrate, tremulousness, nervousness, and frustration as "symptoms associated with [Mr.] Kincade's Meniere's attacks."  (Doc. 6-11, p. 54).

Dr. Simpson reported that Mr. Kincade's auditory brainstem response and abnormal VNG "point[ed] to . . . [a] central source for dizziness."  (Doc. 6-11, p. 53).  Dr. Simpson stated that Mr. Kincade planned to see a neurologist because of the centralized indication.  (Doc. 6-11, p. 53).  Dr. Simpson provided the following diagnosis:  "Since VNG doesn't support [an] inner ear source, (which doesn't prove it is not inner ear but points elsewhere), would want both the neurology opinion and additional catecholamine testing." (Doc. 6-11, p. 55).

Dr. Simpson stated that Mr. Kincade's weekly Meniere's episodes normally lasted one or two hours but could extend to three or four days.  (Doc. 6-11, p. 54).  Dr. Simpson noted that periodically Mr. Kincade experienced increased buzzing in the left ear before an attack.  (Doc. 6-11, p. 54).  Dr. Simpson was "uncertain" what triggered or exacerbated Mr. Kincade's Meniere's symptoms.  (Doc. 6-11, p. 54).  Dr. Simpson reported that Mr. Kincade's symptoms from an attack eased over time.  (Doc. 6-11, p. 54).  Dr. Simpson denied that a Meniere's attack would cause days of "confusion and exhaustion" for Mr. Kincade.  (Doc. 6-11, p. 54).

Dr. Simpson listed diuretics, steroids, and vestibular/nausea suppressants as Mr. Kincade's medical therapy. (Doc. 6-11, p. 54). According to Dr. Simpson's notes, Mr. Kincade's response to treatment fluctuated with symptoms clearing up but then recurring. (Doc. 6-11, p. 54). Dr. Simpson opined that Mr. Kincade's impairments had or would last 12 months and that a Meniere's attack would preclude Mr. Kincade "from performing even basic work activities." (Doc. 6-11, p. 55). Dr. Simpson stated that Mr. Kincade would have good and bad days and estimated that Mr. Kincade would miss work four or more days monthly. (Doc. 6-11, p. 55). Dr. Simpson noted that this estimate was "not well defined" and was based on Mr. Kincade's history that included self-reports of weekly Meniere's attacks. (Doc. 6-11, p. 55).

B.     The ALJ's Reasoning

The ALJ gave little weight to Dr. Simpson's opinion. (Doc. 6-3, p. 26). The ALJ discounted Dr. Simpson's opinion because Dr. Simpson lacked training in the disability program and offered a medical source statement at the request of Mr. Kincade's counsel. (Doc. 6-3, p. 26). The ALJ found that the record lacked confirmation of a treating relationship between Dr. Simpson and Mr. Kincade and that Dr. Simpson's opinion lacked underlying support from treatment notes. (Doc. 6-3, p. 26). The ALJ also found that Dr. Simpson's opinion was inconsistent with Mr. Kincade's "routine and conservative medical treatment," Mr. Kincade's "largely

stable physical condition," and Mr. Kincade's daily activities, including managing medical appointments. (Doc. 6-3, p. 26). The ALJ noted that Dr. Simpson's conclusion about Mr. Kincade's inability to work was "an administrative finding reserved to the Commissioner." (Doc. 6-3, p. 26).

C.    Analysis

Mr. Kincade maintains that the ALJ should have accepted the medical source statement that Dr. Simpson completed. (Doc. 8, p. 13). Generally, "the medical opinion of a specialist about medical issues related to his or her area of specialty [is due more weight] than . . . the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). And "[a]bsent 'good cause,' an ALJ is to give the medical opinions of treating physicians 'substantial or considerable weight.'" *Winschel*, 631 F.3d at 1179 (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). When an ALJ does not give a treating physician's opinion considerable weight, an ALJ must clearly articulate the reasons for her decision. *Winschel*, 631 F.3d at 1179. Good cause exists when:

> (1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.

*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004); *Lustgarten v. Comm'r of Soc. Sec.*, No. 17-14763, 2019 WL 6048534, at *2 (11th Cir. Nov. 15, 2019) (quoting *Phillips* for good cause framework).

The ALJ erred in discounting Dr. Simpson's opinion based on the finding that the "medical treatment notes . . . [do not establish] a treating relationship [with Dr. Simpson] . . . before or after [Mr. Kincade's] alleged onset date." (Doc. 6-3, p. 26). Mr. Kincade's medical records confirm that Mr. Kincade saw Dr. Simpson in 2002, 2004, October and November 2016, and January 2017. In June 2016, Dr. Morgan planned to discuss Mr. Kincade's case with Dr. Simpson. *See* 20 C.F.R. § 404.1527(a)(2) ("Treating source means . . . [an] acceptable medical source who provides [a claimant], or has provided [a claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [a claimant].")  Consequently, the ALJ's reliance on the absence of a treating relationship to discount Dr. Simpson's opinion is not supported by substantial evidence.

The ALJ gave little weight to Dr. Simpson's opinion because Mr. Kincade's attorney asked Dr. Simpson and Dr. Morgan to complete a functional questionnaire. (Doc. 6-3, p. 26; *see also* Doc. 6-11, pp. 56-57).  But "the mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report." *Tavarez v. Comm'r of Soc. Sec.*, 638 Fed. Appx. 841, 847 (11th Cir. 2016) (internal quotation marks omitted) (quoting *Reddick v. Chater*, 157 F.3d 715, 726

(9th Cir. 1998)). The ALJ erred in discounting Dr. Simpson's opinion because Mr. Kincade's attorney asked Dr. Simpson to complete a functional report.[15]

With respect to the ALJ's finding that Dr. Simpson was not familiar with the "disability program [and] its evidentiary requirements," a source's "understanding of [the] disability programs and the[] evidentiary requirements" is a factor that an ALJ may consider. 20 C.F.R. § 404.1527(c)(6). But the ALJ did not consider Dr. Simpson's ENT specialization when she weighed his medical opinion. (Doc. 14, p. 3); 20 C.F.R. § 404.1527(c)(5). Because the ALJ cited one experience factor but did not discuss the other one, the ALJ's reliance on § 404.1527(c)(6) is an inadequate reason to discount Dr. Simpson's opinion.

Substantial evidence supports the other reasons that the ALJ gave for discounting Dr. Simpson's opinion. The ALJ found that Dr. Simpson did not indicate which medical records he relied on to support his opinion. (Doc. 6-3, p. 26). Dr. Simpson did not attach medical records to the functional questionnaire. (Doc. 6-11, pp. 53-55). But Dr. Simpson did annotate several of his answers, including his estimate that Mr. Kincade would likely miss more than four days monthly due to Meniere's disease. (Doc. 6-11, p. 55). Dr. Simpson stated: "This is

---

[15] Mr. Kincade has the burden to prove disability. *See* 20 C.F.R. § 404.1512(a); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *Bailey v. Soc. Sec. Admin., Comm'r*, 791 Fed. Appx. 136, 139 (11th Cir. 2019) (citing *Moore*). Consequently, counsel's request that Dr. Simpson provide a treating source statement for Mr. Kincade is logical.

a not well defined estimate based on [Mr. Kincade's] history and having [t]his problem weekly on average." (Doc. 6-11, p. 55). The ALJ could reasonably conclude that Dr. Simpson's statement concerning absenteeism was not reliable because Dr. Simpson based the answer on Mr. Kincade's self-reports of weekly Meniere's episodes. And the ALJ discounted Mr. Kincade's subjective testimony, a finding which Mr. Kincade appears to challenge only with respect to daily activities. (Doc. 8, pp. 23-25). Consequently, the ALJ had good cause to discount Dr. Simpson's "not well defined" estimate of the days Mr. Kincade would miss due to Meniere's symptoms.

Substantial evidence supports the ALJ's finding that Dr. Simpson's opinion was inconsistent with Mr. Kincade's medical records. (Doc. 6-3, p. 26). Following his May 2016 onset date, Mr. Kincade's medical records reflect periodic flare-ups and gaps in treatment. Mr. Kincade saw Dr. Morgan once in 2016 and Dr. Simpson three times from 2016 to 2017. After a Meniere's attack, Mr. Kincade reported hearing loss, vertigo, imbalance, tinnitus, and nausea. Mr. Kincade's treatment regimen of steroids, Valium, hydrochlorothiazide, and other medication varied little during these visits. After receiving treatment, Mr. Kincade reported improvement or did not return for treatment until he had another attack. According to Dr. Simpson, as of October 2017, Mr. Kincade was taking only hydrochlorothiazide to manage his Meniere's symptoms. (Doc. 6-11, p. 54). Consequently, substantial

evidence supports the ALJ's finding that Mr. Kincade experienced periods of Meniere's flare-ups with significant symptoms followed by months of stability with conservative treatment. (Doc. 6-10, p. 28; *see* Doc. 6-11, p. 54). Therefore, the ALJ appropriately discounted Dr. Simpson's opinion that Mr. Kincade would miss more than four days monthly due to Meniere's symptoms.

The ALJ also relied on Mr. Kincade's ability to perform daily activities and attend medical appointments to discount Dr. Simpson's opinion. (Doc. 6-3, p. 26). Mr. Kincade's treatment records with Dr. Elliott support this finding. Mr. Kincade saw Dr. Elliott for primary care three times in 2017. Mr. Kincade told Dr. Elliott that he was dealing with Meniere's problems, but he also reported that he had a good exercise routine, no physical disability, and normal daily activities. (Doc. 6-11, pp. 7, 13, 23). Mr. Kincade identified some medical records which contain notes about him missing a therapy appointment because of Meniere's symptoms and experiencing chronic vertigo and tinnitus. (Doc. 8, pp. 22-23; Doc. 6-11, pp. 30, 32). But the existence of contrary daily activity evidence does not mean that the ALJ's reason for discounting Dr. Simpson's opinion lacks substantial evidence—the ALJ must substantiate good cause adequately, not perfectly.

Consistent with *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 Fed. Appx. 875 (11th Cir. 2013), the ALJ appropriately discounted Dr. Simpson's opinion that Mr. Kincade would be unable to perform basic work activities because of Meniere's

disease. (Doc. 6-3, p. 26; Doc. 6-11, p. 55). Under the Social Security Act, "the Commissioner, not a claimant's physician, is responsible for determining whether a claimant is statutorily disabled." *Denomme*, 518 Fed. Appx. at 877. And "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled." *Denomme*, 518 Fed. Appx. at 878 (internal quotation marks omitted) (quoting 20 C.F.R. §§ 404.1527(d)(1)).

An ALJ meets the good cause standard by "articulating at least one specific reason for disregarding the opinion [when] the record support [that reason]." *D'Andrea v. Comm'r of Soc. Sec. Admin.*, 389 Fed. Appx. 944, 948 (11th Cir. 2010). Although the ALJ's opinion contains several errors, under the social security regulations and circuit precedent, substantial evidence supports the ALJ's decision to discount Dr. Simpson's opinion.

D. Mr. Kincade's RFC Challenge

Mr. Kincade challenges the ALJ's RFC determination, arguing that the daily activity evidence does not establish that he can perform light work. (Doc. 8, pp. 23-25). As explained above, several medical records show that Mr. Kincade's Meniere's disease did not prevent him from exercising, performing daily activities, or traveling to the beach. Also, the ALJ discounted Mr. Kincade's subjective testimony for reasons beyond his daily activities. (Doc. 6-3, pp. 26-27). Mr.

Kincade does not contest those reasons, and an ALJ does not have to include limitations within an RFC when substantial evidence supports the ALJ's reasons for excluding them. Consequently, on this record, the Court finds no error in the ALJ's formulation of Mr. Kincade's RFC.

## V.    CONCLUSION

As stated above, this Court may not substitute its judgment for the judgment of the ALJ. Because substantial evidence supports several of the ALJ's reasons for discounting Dr. Simpson's opinion, the Court affirms the Commissioner's decision.

**DONE** this 30th day of March, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE